## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Special Agent Kevin M. Doheny, being duly sworn, hereby depose and state the following:

1. This Affidavit is submitted in support of Applications for Search Warrants to search the contents of the following electronic devices:

    a. LG Virgin Mobile cell phone, in Evidence as Exhibit N-145 ("DEVICE");

in order to secure evidence of violations of the following statutes: Title 21, United States Code, Sections 841(a)(1), Distribution and Possession with the Intent to Distribute a Controlled Substance, and 846, Conspiracy to Distribute a Controlled Substance.

## AFFIANT EXPERIENCE

2. I am a Special Agent with the Drug Enforcement Administration (DEA), United States Department of Justice, and as such I am empowered under Title 21, United States Code, section 878, to enforce Title 21 and other criminal laws of the United States, to make arrests and obtain and execute search, seizure, and arrest warrants. I have been employed as a DEA Special Agent for over one year, with seven years of prior law enforcement experience with the Panama City Police Department, Panama City, FL. In connection with my official duties, I investigate criminal and civil violations of the Controlled Substances Act, and I have testified in judicial proceedings for violations of laws concerning controlled substances. During my time with the DEA, I have participated in numerous drug trafficking investigations, including investigations that have resulted in felony arrests for violations of Title 21 of the United States Code. I have

been involved in various types of electronic surveillance, in the execution of search and arrest warrants, and in the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealing of proceeds from controlled substance trafficking, as well as analysis of toll and financial records, analysis of data derived from the use of Pen registers and trap and traces, and the interception of wire communications.

3. I have knowledge of the facts set forth in this affidavit based on my own participation in this investigation and based on information provided to me by others mentioned herein, including DEA agents, other local and federal law enforcement officers, and others. This affidavit is intended to set forth probable cause in support of the application for search warrant and does not purport to set forth all of my knowledge regarding this investigation.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

4. Based on my training and experience, I know about the following items.

5. A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and

storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites.  Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone device.  A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices.  A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords.  Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts.  Wireless telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet. They may also include GPS technology for determining the location of the device.  Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data, and can have the capacity to store many gigabytes of data.  Some cellular telephones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations. Some cellular telephones also operate as a "tablet," or mobile computer, and can contain software programs called applications.  Those programs can perform different functions and save data associated with those functions, including use associated with the Internet.

6. Based on my knowledge, training, and experience, I know that certain electronic devices can store information for long periods of time. Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device. This information can sometimes be recovered with forensic tools.

7. Based on my knowledge, training, and experience, examining stored data on electronic devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage device.

8. There is probable cause to believe that things that were once stored on the DEVICE may still be stored there, for at least the following reasons:

    A. Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    B. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a

computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

C.  Wholly apart from user-generated files, computer storage media including digital storage device and computers' internal hard drives can contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

D.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

9.  *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the DEVICE that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the DEVICE was used, the purpose of the use, who used the DEVICE, and when. There is probable cause to believe that this forensic electronic evidence might be on the DEVICE because:

A. Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage device or other external storage media, and the times the computer or device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created. This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

B. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

C. A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic device were used, the purpose of their use, who used them, and when.

D.  The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer or digital storage device and the application of knowledge about how a computer or digital storage device behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

E.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

F.  I know that when an individual uses an electronic device to aid in the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain information pertaining to the drug trafficking activities of Corina HOLDER as well as the means by which he may have communicated with his co-conspirators.

G.  I also know that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format (such as saving a .pdf image file as a .doc document file), or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

10. *Need to review evidence over time and to maintain entirety of evidence.*  I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches.  I advise that it would be impractical and infeasible for the Government to review the mirrored images of a digital device that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  I have learned through practical experience that various pieces of evidence retrieved from a digital device in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review, and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed.  The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum.  Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not

preserved along with the original. In the past, I have reviewed activity and data on digital device pursuant to search warrants in the course of ongoing criminal investigations. I have learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, I respectfully request the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

11. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying, and reviewing the contents of the DEVICE consistent with the warrant. The warrant I am applying for would authorize a later examination and perhaps repeated review of the DEVICE or information from a copy of the DEVICE consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium,

that might expose many parts of the DEVICE to human inspection in order to determine whether it is evidence described by the warrant.

## PROBABLE CAUSE

12. Since 2018, the DEA Grand Junction Resident Office (GJRO), the DEA Glenwood Springs Post of Duty (GSPOD), and the Western Colorado Drug Task Force (WCDTF) have been conducting an investigation into the distribution of fentanyl in the Western Colorado region. Through this investigation, agents have identified Bruce Holder as a source of counterfeit trademark opiate pills containing fentanyl. Bruce Holder had a vast fentanyl pill distribution network, which included numerous family members, including his ex-wife Corina Holder, and friends.

13. On June 10, 2018, individuals, identified by the initials J.A. and A.R., consumed fentanyl pills and overdosed. Emergency personnel responded to the scene and administered naloxone (an overdose reversal agent also referred to as Narcan). J.A. was transported to the hospital, and survived. A.R., however, died on scene. Analysis revealed that A.R. died from an acetyl fentanyl related overdose. Through the investigation, Jessica Brady was identified as the person who provided J.A. with the fentanyl pills that caused J.A.'s and A.R.'s overdoses.

14. On June 29, 2018, and July 10, 2018, agents conducted interviews of Jessica Brady, who was not fully truthful. Initially, Brady minimized her involvement with J.A. and the fentanyl pills, claiming that she only directed J.A. to a source of the pills. However, Brady did allow agents to look at her cell phone. The phone contained a text message conversation with J.A. I reviewed this conversation, which showed that on June 9, 2018, Brady and J.A. set up a

drug deal for 7 pills. In the text messages, Brady explained to J.A. that she needed to meet with her neighbor and source of supply, who was later identified as Geri Bochmann. The text messages indicated that on June 10, 2018, Brady met J.A. at a Burger King on North Ave, at approximately 5:30 p.m., for a drug exchange. Brady admitted to orchestrating the drug deal, but claimed she did not actually distribute the fentanyl pills that J.A. received.

15. On October 2, 2018, DEA Task Force Officer ("TFO") Blake McClellan and I spoke with Geri Bochmann at Burger King on North Ave. Bochmann initially downplayed her involvement with the fentanyl pills as she explained that she got a couple of fentanyl pills that were passed down from different people. Bochmann stated that in the spring of 2018, she found "Kyle" laying in his room in his own vomit, which she believed was from the pills. Bochmann also explained that she heard from people that the pills contained fentanyl. Bochmann stated that she would get the pills "from Jessica, I think," and stated that "Jessica" lives by her apartment, but she does not know her last name. Agents believed Bochmann was referring to Jessica Brady. Based on the investigation to that point, Agents believed Bochmann was being untruthful and confronted her about minimizing her involvement.

16. Bochmann admitted she was initially untruthful and admitted her involvement with the fentanyl pills. Bochmann explained that she bought pills for two people, one of them being Jessica Brady. Bochmann explained that she purchased the pills from Corina HOLDER in order to give them to Brady. Bochmann did not remember the date of the particular exchange, but stated that she drove Brady to Burger King. Once at Burger King, Bochmann brought Brady's money to Corina HOLDER, who was waiting in the parking lot. Bochmann stated that she

purchased the pills from Corina HOLDER, returned to her car and provided the pills to Brady. Bochmann then observed Brady meet with a male, whom Bochmann later learned was J.A., and give the pills to the male.

17. On October 23, 2018, DEA Special Agent Aimee Koontz and I conducted an interview with Corina HOLDER. During this interview, Corina HOLDER admitted to selling fentanyl pills to Geri Bochmann. Corina HOLDER explained that she purchased the pills from Bruce Holder. She specifically denied ever purchasing pills from Lexus Holder.

18. On October 29, 2018, I looked at information obtained via administrative subpoena related to Corina HOLDER's phone communications. From this information, it was evident that Corina HOLDER spoke with Bochmann and Lexus Holder on numerous occasions leading up to the drug deal on June 10, 2018. On June 9, 2018, Corina HOLDER and Bochmann had 7 phone contacts, while Corina HOLDER and Lexus Holder had 1 phone contact. On June 10, 2018, Corina HOLDER and Bochmann had 7 phone contacts, while Corina HOLDER and Lexus Holder had 11 phone contacts. I recalled that during the prior interview Corina HOLDER stated that she got the pills from Bruce Holder prior to selling them to Bochmann. However, her phone records did not indicate any contact with Bruce Holder via phone calls. Rather, it appeared that Corina HOLDER and Lexus Holder contacted each other shortly before the meeting at Burger King.

19. On November 5, 2018, TFO Blake McClellan and I interviewed Corina HOLDER again. This time her demeanor changed from cooperative to aggravated and back and forth. HOLDER was adamant that she did not "sell" the pills, but she admitted to giving the pills to Bochmann. I

questioned Corina HOLDER in reference to her cell phone records from June 2018. I mentioned her contacting Lexus Holder and Geri Bochmann before the June drug deal, and asked how many times she got pills from Lexus Holder. Corina HOLDER stated, "Actually, I never got them from her. Bruce, if I wanted something, he would just leave them there. Like the two times that I actually did get pills, he left them there for me and they were like in an envelope." She explained that Lexus Holder would then contact her and let her know that Bruce Holder left an envelope for her. Corina HOLDER added, "So I'd go get it and there would be, it'd only be like 10." This reference to 10, referred to 10 fentanyl pills. During this conversation, Corina HOLDER changed her story regarding twice selling pills to Geri Bochmann by stating that she "didn't really sell" and I explained that we don't need to play semantics with words. When I explained that either way Corina HOLDER distributed pills to Bochmann, she agreed. When Corina HOLDER got pills for Bochmann, HOLDER stated "I went one time to Lexus's and one time to Bruce's." Corina HOLDER could not remember whose house she went to first.

20. On January 17, 2019, Jessica Brady was arrested for an outstanding warrant for violation of probation. I spoke with Brady while she was in handcuffs in the back seat of the marked Grand Junction Police Department vehicle. I read Brady her Miranda Rights, which she stated she understood and waived. Brady explained J.A. called her for days asking for the pills, which she clarified were the little blue fentanyl pills with "30" on them. Brady explained that she arranged to get the pills for him by going to Geri Bochmann's house because Bochmann knew Corina HOLDER, Bochmann's source for the pills. Brady drove Geri Bochmann to Burger King on North Avenue and met J.A. there. J.A. gave Brady the money for the pills and, in turn,

Brady gave the money to Bochmann. Brady drove Bochmann to Corina HOLDER's house, where Bochmann went to Corina HOLDER for the pills. Bochmann then got back in the car with Brady, and Brady drove them back to the Burger King. While at Burger King, Bochmann gave Brady the pills. Brady got out of her vehicle and got into J.A.'s car. Brady gave J.A. all of the pills, and then J.A. gave Brady one pill for setting up the drug deal. Brady concluded by stating "that's exactly how it happened."

21. On January 25, 2019, Lexus Holder was arrested for distribution of fentanyl resulting in death, conspiracy to distribute more than 400 grams of fentanyl, and distribution of fentanyl. After her arrest, Lexus Holder was transported to the Mesa County Sheriff's Office, where she agreed to be interviewed by agents. Lexus Holder recalled that when she moved back to Grand Junction from Utah, Bruce Holder gave her mother, Corina HOLDER, fentanyl pills to sell so Corina HOLDER would have money. Lexus Holder stated that sometime in the spring of 2018, Bruce Holder left an envelope that contained fentanyl pills with Lexus Holder to give to Corina HOLDER because Bruce Holder and Corina HOLDER did not get along. During the interview, Lexus Holder explained that Corina HOLDER told her they were pills and they were sealed in a regular sized envelope.

22. On August 21, 2018, pursuant to a federal arrest warrant, Bruce Holder was arrested and he was found to be in possession of a cell phone. Pursuant to a federal search warrant, Digital Examiner Mary Speer provided agents with a mobile findings report for the phone. During the examination of the mobile findings report, it was discovered that Bruce Holder used his phone to set up and conduct drug transactions, including with Corina HOLDER.

23. On March 29, 2018, Corina HOLDER sent Bruce Holder the following text message: "So since its my bday can you give me a few blues.  Please."  Based on my training and experience, as well as this investigation, I know that "blues" refers to counterfeit fentanyl pills.  Accordingly there is probable cause to believe there is evidence related to distribution of fentanyl present on Corina HOLDER's phone.

24. On January 25, 2019, Corina HOLDER was arrested for distribution of fentanyl resulting in death.  At the time of her arrest, Corina HOLDER was in possession of an LG Virgin Mobile cell phone.  I collected the phone and put into evidence at the DEA GJRO.

25. Based on the forgoing, there is probable cause to believe that Corina HOLDER distributed fentanyl and conspired with others to distribute fentanyl.  Additionally, as noted above, there is probable cause to believe that Corina HOLDER utilized the DEVICE in furtherance of her drug trafficking activities.  Moreover, based on my training and experience, I know that transporters and distributors controlled substances are frequently in contact with their primary source of supply and/or other distributors of controlled substances.  There is probable cause to believe information related to these communications and the identities of any co-conspirators will be found on the DEVICE.

## CONCLUSION

Based on the foregoing information, I respectfully request that this Court issue a warrant for the search of the electronic device identified in Attachment A for the items listed in Attachment B, constituting evidence of violations of Title 21, United States Code, Sections

841(a)(1), Distribution and Possession with the Intent to Distribute a Controlled Substance, and 846, Conspiracy to Distribute a Controlled Substance.

I, Kevin M. Doheny, being duly sworn according to law, hereby state that the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information and belief.

*s/ Kevin M Doheny*
Kevin M. Doheny, Special Agent
Drug Enforcement Administration

Submitted, attested to, and acknowledged by reliable electronic means on April __5__, 2019.

GORDON P. GALLAGHER
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO

This Application and Affidavit was reviewed and submitted by AUSA Jeremy Chaffin.

## ATTACHMENT A

### DESCRIPTION OF LOCATION TO BE SEARCHED

An LG Virgin Mobile cell phone, seized on January 25, 2019, from Corina HOLDER and currently held as evidence by the DEA as Exhibit N-145 (hereinafter and in Attachment B as the "DEVICE")

## ATTACHMENT B

### DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

For the DEVICE listed and described in Attachment A, the following items, that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), and 846:

1. Any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of Title 21, United States Code, Sections 841(a)(1), and 846.

2. Any and all address books, names, and lists of names and addresses of individuals who may have been contacted by use of the DEVICE or by other means for the purpose of committing violations of Title 21, United States Code, Sections 841(a)(1), and 846.

3. Any and all information, records, documents, invoices and materials, in any format or medium, that concern any accounts with an Internet Service Provider pertaining to violations of Title 21, United States Code, Sections 841(a)(1), and 846.

4. Any and all information, records, documents, invoices and materials, in any format or medium, that concern e-mail accounts, online storage, or other remote computer storage pertaining to violations of Title 21, United States Code, Sections 841(a)(1), and 846.

5. Records of Internet activity, including Internet Protocol addresses, firewall logs, transactions with Internet hosting providers, co-located computer systems, cloud computing services, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses pertaining to violations of Title 21, United States Code, Sections 841(a)(1), and 846, or that show who used, owned, possessed, or controlled the DEVICE.

6. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium, pertaining to use or ownership of the DEVICE, or that aid in the identification of persons involved in violations of Title 21, United States Code, Sections 841(a)(1), and 846.

7. Photographs and digital images, including still photos, videos, films, and the contents therein, in particular, photographs of co-conspirators, of assets and/or controlled substances.

8. Credit card information, bills, and payment records pertaining to violations of Title 21, United States Code, Sections 841(a)(1), and 846.

9. Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of Title 21, United States Code, Sections 841(a)(1), and 846.

10. Evidence of who used, owned, or controlled the DEVICE to commit or facilitate the commission of the crimes described, or at the time the things described in this warrant were created, edited, or deleted, including photographs, videos, logs, call logs, phonebooks, address books, contacts, IP addresses, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, search terms, metadata, user profiles, e-mail, e-mail contacts, messages (text or voice), instant messaging logs, file structure and correspondence.

11. Evidence of software that may allow others to control the DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security provisions or software designed to detect malicious software or unauthorized use of the device, and evidence of the lack of such malicious software.

12. Evidence of the attachment to the DEVICE of other storage device or similar containers for electronic evidence.

13. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the DEVICE.

14. Evidence of how and when the DEVICE were used or accessed to determine the chronological context of computer access, use, and events relating to the crime under investigation and to the computer user;

15. The telephone number, ESN number, serial number, and/or SIM card numbers of or contained in the DEVICE.

16. Passwords, encryption keys, and other access device that may be necessary to access the DEVICE.

17. Contextual information necessary to understand the evidence described in this attachment.

DEFINITIONS:

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).